2020-2025. Mr. Berger. Yes, thank you very much. This case does raise quintessential factual issues all the way through. We understand what the substantial evidence standard is, but our position here is that looking at this record as a whole with respect to the reasoning that supports each of the reasonings in this case, the record certainly, in our view, detracted from the weight of the evidence relied upon by the board. We have evidence here that is cited in our brief that was wholly ignored by the board that indicates that these reasons should not have been sustained, and we don't believe substantial evidence supports the various reasons. With respect to reason one, which has to do with the misuse of a government vehicle, understanding that this is a statutory misuse charge requires a proof of an element of willfulness. I suppose the issue here is how do we gauge the state of mind of an employee where you have an agency with a national policy that has a certain policy regarding government vehicle use restrictions, etc., and if we have a deviation from that policy in a local office where the employees such as Meisenheimer, as well as the supervisor, together have authorized his use of this government vehicle for the purposes that were established at the hearing, and we know from the record in this case that Mr. Meisenheimer's use of that government vehicle was utterly open, was utterly obvious. He recorded it faithfully in his vehicle logs. We know that the supervisor, Mr. Testaverde, testified that he reviewed those vehicle logs on a monthly basis, that he actually signed off on them. He was aware, he says, and he looked for the destinations of Mr. Meisenheimer, and he never counseled him. He never told him to stop. We also have evidence in the record not only that Mr. Testaverde, the supervisor at Appendix 120, was aware that he was reporting in his vehicle where he was going on these personal appointments, that he also indicated that he was accommodating Mr. Meisenheimer, that's in Appendix 130, that he made accommodations for him to attend personal appointments. So when we're dealing with issues where the local supervisor and the employee together have a mutual understanding that it is appropriate and okay to use the government vehicle for the use that he's serving. Counsel, this is Judge Stoll. You know, one thing I'm thinking about with hearing what you're saying is, at Appendix page 817, something that the board said was that in observing Testaverde, I found his demeanor consistent with providing truthful testimony. He came across as thoughtful and forthcoming. Ultimately, I found Testaverde's testimony denying he ever gave the appellant permission to use his government authoring vehicle to drive to personal appointments far more credible than the appellant's testimony of the contrary. I mean, I'm having a hard time. I understand the facts that you're pointing out, but we don't have Testaverde's testimony denying that he ever gave the appellant permission to use his government authoring vehicle in the way that he was using it. I understand that. But Appendix 130, I would only point out at the very bottom, Appendix 130, lines 24 and 25, Mr. Testaverde was asked specifically about those accommodations, and he said, and he may have seen those accommodations to include the use of the GOV, which was never addressed. Okay. So we don't have an explicit authorization, but certainly the behavior of Mr. Testaverde clearly, in our view, implied that he authorized it because he had knowledge of the use. He did check the logs on Appendix 120. He indicates that he viewed all the vehicle logs for the accuracy of destinations. He said that Meisenheimer might have understood that the use of the GOV was okay, although I never addressed it. So the question is whether the implied authorization or tacit authorization or even condoned authorization would serve here to undermine that credibility determination. And that's what the point of this brief is. I understand that she's observing demeanor. The judge is observing demeanor, but the judge can't ignore the testimony, this rather hesitant testimony of Mr. Testaverde in which, you know, he indicates that on a day-to-day basis, well, he may have understood that he could use the GOV. When did he come to that understanding? When did he come to that understanding? Well, how am I supposed to review credibility determinations when it's based on demeanor? I mean, there's Supreme Court cases that say those are virtually unrevealable, right? As an appellate court, I'm just looking at a paper record. And how can somebody on a paper record make a credibility determination that's contrary to the fact finder that actually got to see the witness? I could only say that the caveat of virtual suggests that there's room for making a separate assessment and relying on Mr. Testaverde's own testimony. It belies that credibility determination. If on page 120 of the appendix that he views, where you have an employee who is disclosing, obviously, like a neon sign going on and off to his supervisor that I'm going to these seven personal appointments, and the supervisor attests that he looked at those vehicle logs and said nothing, and understood the vehicle logs, signs off on them, and says nothing. And then he says, I even made an accommodation for him to go to those personal appointments. And he might have thought that he could use the GOV. I didn't address it. I understand that. So in a situation like that, I think the cold transcript does undermine that credibility determination. I remember correctly that there were a few emails that were sent to your client that told him that he would not be using his vehicle in that manner for personal use, right? He did have a couple of emails. He received a couple of emails that told him that point blank, right? Yes. There was one email that the agency relies on. It's the email of December 17th of 2017, which was after all the use issues. But there's no... And that was after all the use issues. And apparently that email was given, you know, was sent to him at that time because of the use issue. I believe that's at Appendix 252. Yes. There's an employee counseling email of December 7th, 2017 at Appendix 252. And it comes from Mr. Lagerwey, a supervisor who's not in the local office. And the way that we understood this email was that apparently there was some confusion concerning the use of the GOV, and this email sorted it out once and for all. We're not disputing that... 2017, right? December 7th, 2017 email? Okay. Right, right, right. So that came afterwards after all the misuse allegations. But nevertheless, our position is that we understand it as a nationwide agency-wide policy. The real issue, I think in this case, and I know in this case, is what happens if we have a deviation, and what does that say about willfulness? What does that say about, you know, his state of mind? Yeah, maybe he made a mistake, and maybe he was even negligent. But the question is, was he willful or reckless to the point that he doubted the propriety of his own actions? And all I'm saying is that somebody who's so transparent about what he's doing, and telling his supervisor every day what he's doing, I don't think doubted that in his state of mind. That's why I don't think the statutory misuse is proven in this case. And, you know, likewise, we have the second charge, you know, which was the inaccurate reporting of the sustained specifications, and we had 12 specifications sustained. And, you know, we have the same problem, which is that you have a supervisor that seems to be going along, right, going along and accommodating this employee. And only in a look-back, we use the word post-hoc in his previous arguments, only in a look-back are we saying he did something wrong. But at the time, this employee understood that the supervisor was accommodating him for his personal appointments, and as the supervisor says on page, again, appendix 130, he says, I have it right here, I just went over it before, it's right here, it's you made accommodation, appendix 130, line 20, you made accommodations, answer yes, that's correct, and he may have seen those accommodations to include the use of a GOV, but he made accommodations. So we're back to the issue of, okay, our guy is, Meisenheimer is reporting his personal visits on his time and attendance sheets. He's not concealing them. He's not pressing them. He's not, well, that was quick. Okay. I'll run through the rest if that's okay. Is that all right? You'll what through the rest? Can I go through the rest of my argument if I keep it short? Well, right now, you're using your rebuttal time. Okay. All right. Thank you. I'm going to go through the rebuttal time then. Anyway, my point is that the accommodation issue is of the same. The reason three has to do with the violation of internal policies when he helped to interdict a gate runner at the Port of Alaska, and my only point there is that I don't think that anyone would expect a paid law enforcement officer, paid to work to confront hazards, to stand mute, where you have a gate runner that's eluding security on a bike and a backpack running in a secure area, the Port of Alaska, towards, they thought, fuel tanks, and at two or three seconds that Meisenheimer had to assess whether, in fact, this was a threat or not, he acted in order to help interdict this gate runner. He was requested for help by the captain of the Port of Alaska, and that's at Appendix 118, that corroborates that he was requested to help. He did help, and I pointed out that the agency policy, in fact, allows the intervention, the response of their law enforcement officers for emergencies, and that means gratuitous responses, and he did so, and it was consistent with policy. So he didn't stand mute, he did what he was asked to do by the captain, and he intervened to help stop a gate runner who was eluding security. Reason four has to do with the unlawful possession of marine mammal parts. I'll only say this, I believe that it's the wrong charge. The record shows that he had the right to collect the mammal parts, he just didn't register them within 30 days of collection. He's charged with unlawful possession, so if someone collects the mammal parts but doesn't register them, does that mean that they don't lawfully possess them? We don't believe that possession has been shown to be unlawful, he just failed to register. He's charged with unlawful possession, not failed to register. And lastly, the lack of candor charge, that goes back to the issue of his use of the government vehicle. He understood, we understand with lack of candor, that state of mind evidence is necessary, there's a knowingness element to candor. Did he know that he was deceiving anyone when he felt that common practice allowed for the use of the G-Ride as he did? Did he lie when he said he had authority to go on personal appointments? Well, based on his supervisor's behavior, Meisenheimer could have believed in all sincerity that he was allowed to do so and that he was authorized to do so. So the record of factual issues in this case detract from the weight of the evidence relied upon by the agency. And we ask that you reverse this. This is Jeff Trondek. Can I just ask you a clarifying question? On the mammal parts piece, was failure to register the only wrong as to each of the mammal parts or was at least one that he wasn't allowed to take in the first place? That is, my interpretation of the record is that's correct. There was a question as to whether he had actually collected an endangered species, but that was not resolved. And it was not found in this record to have happened. The deciding official testified that he did not make a finding that he collected an endangered species. And we have that here. So the only issue is the failure to register. He's not charged with failure to register. So that's why we believe the charge can't be supported. Okay. Why don't we hear from Ms. Matau now? Yep. Thank you. Good morning, your honors, and may it please the court. Anne Matau on behalf of the United States. This court should affirm the MSTB's decision because substantial evidence supports the board's conclusion that the Department of Commerce proved all five charges of misconduct against Mr. Meisenheimer by a preponderance of the evidence and that the penalty of removal was within the bounds of reasonableness. As to the first charge, misuse of a government vehicle. Mr. Meisenheimer was warned in writing and orally before the misconduct of misusing his government vehicle in 2017, not just after. At appendix 168, there is an email from May 12th, 2016, from his direct supervisor, David Testaverde. And in the last paragraph, he says, please keep in mind that you have- What are you reading from, please? Oh, I'm reading from the last paragraph of appendix 168, your honor. 168, thank you. Yeah. And please keep in mind that you have home-to-work authorization for your government vehicle. It is for work purposes, government use only. It is not meant for you to take, to make repeat trips to include personal use. This may be considered abuse of this privilege or even misuse of a government vehicle. So he was warned prior to the misconduct in 2017 that serves as the basis of his charge. He was again warned on May 14th, 2017, so during the time that he was committing the misconduct, that his second level supervisor, Nathan Blaggerway, emailed him. This is at appendix 169. And his second level supervisor told him that he was, again, not allowed to use his government vehicle for personal use because the policy clearly provides that employees may not deviate from their direct route except for going on a meal break. So he was warned prior to the misconduct in 2017. Mr. Meisenheimer repeatedly claims that he was given either an explicit approval or an accommodation to drive his government vehicle to personal appointments. But as Judge Stoll asked Mr. Berger during his argument, the ALJ very thoroughly weighed the credibility of both individuals, Mr. Meisenheimer and his supervisor, and she found that his supervisor's testimony was more credible under the circumstances. And she did not find that Mr. Meisenheimer's testimony was credible. And she thoroughly explained why she found his testimony not to be credible. At appendix 12 and 13 and 14 of the board's decision, the ALJ explained that Mr. Meisenheimer's testimony was inconsistent with the plain text of the policy. The prior written warnings that he received, he didn't present any other evidence that other officers did this or testimony from other officers corroborating his statements. And as to the issue of state of mind, for misuse of a government vehicle, willful use can be shown that an employee acted in reckless disregard for whether the use would be non-official. And here, the ALJ found that the warnings Mr. Meisenheimer received should have raised a significant question in his mind, whether his use was permissible. And that his failure to follow up... This is Judge Toronto. With respect to, I guess it's the second charge, what was the testimony by Mr. Testiverde and what was the administrative judge's finding about the daily logs? The logs that he, that Mr. Meisenheimer wrote about the implicit condemnation, is that what you're asking, Your Honor? Yes. Sure. So at appendix 19 of the judges, the ALJ's decision, the judge did not ignore Mr. Meisenheimer's claim of implicit condemnation. The ALJ did acknowledge that Mr. Meisenheimer's logs disclosed driving the vehicle to the hospital and appointments, but she found more compelling Supervisor Testiverde's statement that his approach to managing Mr. Meisenheimer was hands-off and that he did not know he was using his government vehicle for personal use. And that's consistent with appendix 114 and 115. That's a March 2019 memorandum of an interview that Department of Commerce took of Supervisor Testiverde, where he again said he thought that Mr. Meisenheimer was taking his personal vehicle to these appointments. And, you know, Mr. Berger did say on, during his argument that, you know, Mr. Meisenheimer... I'm a little confused. So there's use of the vehicle and then there's reporting time and attendance, which seem to me two separate things. And I guess I just need to understand a little bit better than I do at the moment, what Mr. Testiverde testified about what he knew about either one of those from the logs that I gather it was his job to review. Yes, Your Honor. He testified, and that's at appendix 130, the testimony that Mr. Berger was pointing to. He testified that he allowed Mr. Meisenheimer to go to personal appointments during the day as long as he took leave, flexed his day, or made up the time. But he never authorized Mr. Meisenheimer to take his government vehicle to these appointments or work less than eight hours. So I think, you know... I'm still not at least understanding the responsiveness. What did Mr. Berger say about what was on Mr. Meisenheimer's logs? He reviewed the logs and signed them. That's true. And the ALJ acknowledged that, you know, that doesn't make his supervisor look very good, that, you know, he did sign these logs. But what his supervisor testified to was just based on the logs that say hospital and VA and appointments. He did not know that he was driving his vehicle, his government vehicle, to those appointments. But he did know that that time was counted in, I'm just going to make up this figure, the eight-hour workday? No, he did not. He never allowed Mr. Meisenheimer to work eight hours less. He testified that in reviewing the logs, he didn't know that he was doing either of those things. And I do think it's worth pointing out that the logs, and you can see they made a set appendix 146, 151, 152. These are the example logs that his supervisor was looking at. They only say that Mr. Meisenheimer was going to VA or hospital, you know, just one word. They do not say, for example, I took my wife to a medical appointment in my, you know, government vehicle. Can I switch topics? This middle charge, number three, about turning on the sirens and lights to help the Port of Alaska's authorities when there seemed to be an urgent threat. Justify that for me. It seems on its face rather strange. Sure, Your Honor. So the third charge is that he violated OLE policy, and specifically the policy is 5.2.4 E and G. Which can be found at appendix 268 and 269. And those policies prohibit vehicle pursuits of all kinds, as well as conducting stops with emergency lights and sirens. Mr. Meisenheimer was previously suspended in 2013 for exceeding his authority as an enforcement officer when he initiated a traffic stop with emergency lights and sirens. And his suspension documents, they're at appendix 157 and 158, do explicitly say that policy is clear that he is not allowed to stop vehicles, and that is not within his scope of duty. His duty is limited to patrolling the marina, and he enforces wildlife and fishery regulations. He is not a state police officer, and the rules, you know, the policy makes clear that he is not allowed to use his government vehicle, initiate the license sirens, and actually conduct vehicle stops. That is not within his authority. And Mr. Meisenheimer's own incident report that he drafted, which can be found at appendix 189, he admits outright that he knew he didn't have authority, and he initially told the requesting captain that he did not have authority to do so, but that he nonetheless persisted in assisting the security in apprehending this biker. And the ALJ did, you know, take into account Mr. Meisenheimer's claim that he believed the biker to be a credible threat. Again, the ALJ made a credibility determination, and she did not believe that Mr. Meisenheimer actually perceived the biker to be a threat, because he left, you know, the door of his vehicle open. He didn't search the backpack that she had, which was kind of the sole basis of this concern, because the bike might have explosives in it. And so the ALJ did, you know, address that argument and didn't find it credible. And, you know, even if this were a situation where accidents or unusual circumstances were present, preponderant evidence would still support the specifications, because as the ALJ recognized at appendix 50, and as I already, you know, stated, the policy just categorically prohibits vehicle pursuit. And section 5.2.4E says, under no circumstances shall emergency lights be used to stop vehicles. So that the policy is clear, and... And that, I'm sorry, and that includes bicycles? Well, here, here, it does say stop vehicles. I think it's clear that the policy prohibits him from activating his lights and sirens and conducting stops. It does say vehicles, admittedly, Your Honor, but Mr. Meisenheimer had previously been suspended for, you know, similar conduct before, and he does admit in his own incident report that he... Really similar conduct, where another officer asks for help in what on its face appears to be a potentially catastrophic emergency situation. In the prior situation, he was suspended for pulling over a vehicle, and that's what he did here. You know, he pulled over somebody when he's not supposed to do that. And I do understand that Captain Poole asked him to help, but Mr. Meisenheimer is subject to his, you know, specific office's regulations and policies, and he knew, as he said in his incident report, that he doesn't have authorization to conduct a traffic stop or any, or use his lights and sirens to apprehend somebody. And the ALJ, you know, as I said, did address his claim that he thought it was a credible threat, but given that, you know, he left the door of his vehicle open throughout the encounter and he did not actually search or secure a backpack, she did not actually believe that he was a true threat in his mind of the biker. But instead, he knew he couldn't do this and he just nonetheless persisted in doing it anyways. Especially given that his, you know, his jurisdiction is limited. I just, you know, want to repeat that. He is an OLE officer for the National Marine Fisheries Service. He patrolled the marina, and so he doesn't have the same authority as a police officer. And do I understand right that the deciding official said in the decision document that removal would be the chosen penalty under any one of these five charges? He did say that, Your Honor, at Appendix 100. He said each of the five reasons identified, even standing alone, is serious enough to support removal. I think given the repeated nature of the misconduct on some of the specifications and prior disciplinary conduct, and given the high level of trust inherent in his position, yes, the agency official decided that standing alone, any of these charges would be serious enough to support removal. In your red brief, did you rely on that, on the penalty question? Did I rely on that? On the deciding official. I mean, suppose I had doubts about charge number three. Then I need to figure out what to do, right? And there's some rules about that, and one of them has to do with what the deciding official said should be done if not all charges were supported. Did your brief rely on, I guess it's Appendix 100? Well, I think our brief, as far as the penalty goes, Mr. Meisenheimer in his brief had argued that, you know, condemnation of some kind warranted mitigation. So I addressed those arguments. I don't recall in our brief actually addressing the argument if the court does not sustain all the charges, but to address Your Honor's question... I'm not sure the blue brief did either, so... Correct, yes. And so, but if the court was, you know, if the court indicated that it wasn't going to hold up, you know, one of the charges, remand would be unnecessary because the board's decision to sustain removal would be supported by the other charges because the agency said any one of them would support removal. So remand wouldn't be necessary because we have the agency actually saying, you know, standing alone, it would be serious enough to support removal. Counsel, I thought maybe you did say something like this on page 50 of your brief. Oh, okay. I wasn't, I recall in my brief if I actually relied on that exact statement. I might've mentioned it in kind of reiterating, but thank you. I appreciate that, Your Honor. Yes, good. Thank you. Okay. Thank you. I appreciate that, Your Honor. And I will just very briefly address the claim about the unlawful possession of mammal parts since that came up. Again, he doesn't dispute that he collected and possessed the parts. He instead claims that the agency never made a finding about unlawful possession, but that is incorrect. The proposal to remove at Appendix 90, you know, clearly calls reason for unlawful possession of marine mammal parts. And it explains that he collected them, then failed to register them as required. So the failure to register them is what made the possession unlawful and the agency cites to the relevant regulations. And at least based on the findings, it was the failure to register is the only thing that made the continued possession unlawful, right? That is, we don't have an endangered species finding or something like that, or do we? Well, so if Your Honor, I could just answer your question briefly with that. Yes, please. Okay. So the proposal to remove at Appendix 82 says that some of the parts that Mr. Meisenheimer turned in or attempted to register were stellar sea lion parts, which is an endangered species whose parts cannot be kept. And then it further goes on in the final removal decision at Appendix 90 and 91, that Mr. Meisenheimer was responsible for enforcing the Endangered Species Act, and that he knew the office doesn't register parts from the Endangered Species Act because they cannot be legally collected. And at Appendix 92, then the deciding official said, you know, his violations are aggravated because he didn't properly identify the parts. And so the agency did at least put Mr. Meisenheimer on notice of the charge against him and that they believed he failed to comply with the Endangered Species Act. But I agree that the main focus of the charge is- I think if I remember right, Mr. Berger, I think said something to the effect that maybe one of the government witnesses testified that there was in fact no finding that any of the mammals at issue were unlawfully taken by Mr. Meisenheimer. Is it- maybe I've misunderstood that, but I think you must have heard the same thing I did. Can you clarify that? I think Mr. Meisenheimer was talking about his argument that they never- there was- you know, they never actually concluded if these parts, you know, with a DNA test or otherwise, that these parts were endangered species parts. The agency had a biologist look at them, and he identified the parts as Endangered Species Act. Was there testimony at the AHA hearing from a government officer acknowledging the absence of a finding of unlawful taking apart from registration? So they're intertwined, Your Honor. So the regulation that's cited in the- I'm sorry. I'm not asking a simple enough question. Tell me about testimony at the AHA hearing from a government witness if there was such, which is what I understood Mr. Berger to say there was. Don't tell me about the underlying facts. I'm just asking a question about testimony at the AHA hearing. I don't- other than Mr. Meisenheimer's own testimony, no, I don't believe there was testimony from any of the Department of Commerce agents on this particular charge. And, you know, the investigating officials, you know, Mr. Henry and Mr. Ellis, the final deciding official, they based it on his forms that he submitted, which are in the appendix at 201 to 237. Those are the forms that he submitted, you know, acknowledging that he had these parts and that he had held onto for three and a half years. And that's what the at pages 51 and 52 of her opinion, that's what she based her decision on, the documentary evidence in the record that he admittedly had these parts and admittedly did not register them for over three years. Okay. Thank you. Okay. Thank you so much. And Mr. Berger, your rebuttal. Yes. Thank you very much. At appendix 138, the deciding official was questioned about the relevance of the Endangered Species Act. He said he knew the allegations, he knew what those allegations were at the time. At a minimum, he failed to register the parts. So when he's questioned, he said, is it fair to say that the way you looked at this charge, because the general counsel had not opined on whether there was a violation of the Endangered Species Act, you looked at it as a fail to register. Is that right? Answer, yes. So I see this solely as a fail to register act. My point is, the fail to register does not necessarily undermine his right to possess the parts. There are two different claims, two different elements, and like a vehicle that's not registered is still owned by the owner. So we say that the fair to possess charge is not supportable on its face. I want to point out briefly that issue of the use of the vehicle. He informs Testaverde on the seven specifications of reason one in a vehicle log that he took the vehicle for his personal appointments. So Testaverde had to know that he was using the government vehicle for his personal appointments, and he said nothing, and he relied on it. It's obvious that he and Testaverde had an and is going to these personal appointments. And so that goes to his state of mind. I think your time has expired. Okay. All right. Thank you very much for the opportunity to speak. Thank you for the argument, and both counsel, the case is submitted, and that concludes our session for this day. All right. The hearing is adjourned until this afternoon at 2 p.m.